UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| INTERMOUNTAIN FAIR HOUSING COUNCIL, INC., <br><br> Plaintiff, <br><br> v. <br><br> TOMLINSON & ASSOCIATES, INC., LATAH VILLAGE APARTMENTS, LATAH VILLAGE, LLC, GREENFIELD APARTMENTS, GOTTA LLC, GREENFIELD LLC, MICHELLE CHARLTON, TERESA STEWART, and HILLARY HARVEY, <br><br> Defendants. | Case No. 1:21-cv-00506-BLW <br><br> **MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

This is a Fair Housing Act case involving two apartment complexes in Boise – Latah Village Apartments and Greenfield Apartments. Plaintiff Intermountain Fair Housing Council, Inc. (the "Council") alleges that Defendant Tomlinson & Associates, Inc. and three of its employees discriminated against tenants and prospective tenants of the apartment complexes on the basis of race, national origin, color, and familial status. The Council also alleges a negligence claim.

Defendants move for summary judgment on all claims. For the reasons explained below, the Court will partly grant and partly deny the motion, as follows: The Council will be allowed to proceed on its FHA claims, but only to the extent it alleges that Defendants: (1) engaged in racial steering at Latah Village around October 2018; (2) discriminated against black tenants in the enforcement of parking rules at both apartment complexes during the summer of 2020; and (3) discriminated against an Iraqi American tenant of Latah Village during the summer of 2021. To the extent the FHA claims rely on other, earlier incidents of discrimination, they are barred by the statute of limitations, and the continuing violations doctrine expressed in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) does not save those untimely claims. The Council will also be allowed to pursue its negligence claim, but that claim will be restricted to events occurring within the applicable limitations period.

## FACTS

### A. The Complaint

For purposes of this motion, Defendants do not dispute the facts alleged in the complaint. The complaint's central allegation is that Defendants discriminated against black tenants and prospective tenants at the two apartment complexes. The individual incidents of discrimination span a six-year period and defy categorization, as the Council has alleged a variety of different incidents involving

different tenants, different defendants, different alleged practices, and different
dates. Still, though, the Court can pick out two main groupings: (1) allegations
related to enforcement of parking rules at both complexes; and (2) allegations
related to information provided to "testers," *i.e.,* individuals hired by the Council
who posed as prospective tenants.

### 1. Discriminatory Enforcement of Parking Rules

As for discriminatory enforcement of parking rules, the Council alleges the
following incidents:

(1) In 2015, Defendant Charlton, who acted as a property manager at both
apartment complexes, initially refused to grant an extra parking permit
to black African families residing at Latah Village but granted an extra
parking permit to a white household. *Compl.,* Dkt. 1, ¶¶ 27-28.

(2) In the Spring of 2016, a family residing at the Greenfield apartment
complex complained to the Council "that the Defendant would not
grant a reasonable accommodation for a parking permit . . . ." *Id.* ¶ 35.

(3) Sometime between 2015 and the summer of 2016, Defendants
terminated, or attempted to terminate, the leases of three households of
Congolese or Somali-born families for various reasons, including
"violations of parking rules." *Id.* ¶ 33.

(4) In August 2016, the Council met with the Defendants to discuss various
issues, including alleged complaints about discriminatory enforcement
of parking rules, yet after that date, the Council continued to receive
complaints from black African residents of both apartment complexes
regarding discriminatory enforcement of parking rules. *Id.* ¶¶ 38, 40-41.

(5) In September 2016, a black African visitor briefly parked her car in a
space reserved for residents at the Greenfield complex, and the car was
booted. When she asked about having the boot removed, the parking
enforcement agent told her that Defendants had "specifically instructed

[the agent] . . . to show no leniency toward the African residents of Greenfield in enforcing the parking rules." *Id.* ¶ 41.

(6) In November 2016, two service providers visited an African resident of Latah Village. One was white; the other black. Upon returning to their vehicles, they discovered that the black service provider's vehicle had been booted while the white service provider's car had not – even though they parked in similarly marked spaces. *Id.* ¶¶ 42-43.

And then there is a long silence. The Council does allege any specific parking-related incidents in 2017, 2018, or 2019 or early 2020.

The complaint picks up again in the summer of 2020,[1] with this allegation: "In or about June or July of 2020, the Defendants renewed the parking rules and engaged Deep Six Parking and Security Services to enforce the parking rules at Latah Village and Greenfield." *Id.* ¶ 53. The Council further alleges that during July through August 2020, a black African immigrant from Somalia, who had limited English proficiency, informed the Council that "the Defendants renewed their parking rules for Latah Village and that they and their friends were receiving car boots for parking in resident and visitor parking even after the signs indicating the nature of some of the parking spaces had been removed." *Id.* ¶ 54.

---

[1] In one of the administrative complaints discussed below, a tenant of Greenfield Apartments complained of parking-related discrimination in March 2017. *See* Dkt. 27-3, at p. A-23. The Council does not mention that specific incident in its complaint. But even if it had, the analysis would not change, as there is still a long period of silence (more than three years) between that incident and the next specific incident, which relates to the alleged "renewal" of the parking rules in June or July of 2020.

### 2.   Information Provided to "Testers"

As for the allegations regarding information provided to prospective tenants (or, more accurately, individuals posing as prospective tenants), the Council conducted three rounds of testing at Latah Village Apartments – in the fall of 2016, again in late February/early March of 2017, and a third time in October of 2018. Each time, the Council would have testers inquire about the availability of apartments. During the first two rounds of testing, black testers were told apartments were not available, whereas white applicants were told they were. *See Compl.*, Dkt. 1, ¶¶ 39, 45, 46.

The third round of testing had a different purpose. This time – rather than attempting to ascertain whether white and black prospective tenants would be given different information about apartment availability – the testing was aimed at figuring out whether Latah Village maintained and enforced a discriminatory occupancy policy. After the Council learned that a seven-person black African family was being threatened with eviction from their three-bedroom apartment for violating the two-people-per-bedroom occupancy limit, the Council had testers call and inquire about apartments for large families. *Id.* ¶¶ 47-50.

First, the Council had an Iranian tester "with an obvious Iranian accent" inquire about availability at Latah Village for her seven-person family. *Id.* ¶ 48. She was told that her family could not occupy a three-bedroom apartment because

of the two-person-per room occupancy limit, and she was directed to larger apartments. By contrast, white/Caucasian testers with large families were not informed of the occupancy limits. *Id.* ¶¶ 48-50.

### 3.  Other Allegations

In addition to the "parking" and "tester" incidents, the complaint alleges that Defendants discriminated against black tenants in various other ways, including by: (1) conducting surprise- and late-night inspections; (2) improperly reducing security deposits; (3) requiring black tenants to stop providing daycare/babysitting services while not making the same demands of white tenants; (4) making racist remarks; and (5) attempting to shut down a legal Eid celebration. Additionally, the Council alleges that during the summer of 2021, the Defendants discriminated against an Iraqi American tenant of Latah Village by refusing to add a roommate to her lease.

## B.  HUD Complaints

The Council complained of many of these incidents in five separate administrative complaints filed with the United States Department of Housing and Urban Development (HUD), all of which have been dismissed.

The Council filed its first four HUD complaints in early 2018 – before conducting that final, October 2018 round of testing regarding the occupancy

limit.[2] The factual allegations raised in these complaints are described below, but it's worth pausing to note that both parties agree that the events complained of in these four complaints occurred outside the relevant limitations period – even accounting for the tolling period while these complaints pended with HUD. *See Response,* Dkt. 30, at 4.

In *Kere v. Tomlinson*, an African American Muslim tenant of Latah Village alleged that Defendant Tomlinson had discriminated against him on the basis of race, national origin, and religion. He alleged that during 2016 and 2017, Defendant Charlton had conducted numerous surprise inspections, failed to attend to maintenance issues, made discriminatory statements, and required him and other African American and Muslim tenants to pick up cigarette butts of other tenants and their guests, but did not enforce similar rules for non-African American or non-Muslin tenants. *See Ex. A to Penny Dec*., Dkt. 27-3, at pp. A-1 to A-4.

In *Sabiti v. Tomlinson*, an African American tenant of Latah Village alleged that during 2016 and 2017, Defendant Charlton wrongly charged her with a lease violation, related to her minor son making noise in the parking lot and then later refused to renew the lease. Based on these factual allegations, Sabiti alleged that defendants discriminated against her based on her race, national origin, and

---

[2] These complaints are *Kere v. Tomlinson*; *Sabiti v. Tomlinson*; *IFHC v. Latah Village*; and *Hassan v. Tomlinson. See Penny Dec., Ex. A thereto*, Dkt. 27-3.

familial status. *See id.*, at pp. A-5 to A-8.

In *IFHC v. Latah Village,* the Council complained about discrimination at Latah Village based on race, national original, and familial status. The Council complained about the Eid celebration, the first and second rounds of testing it had conducted at Latah Village, and Defendant Charlton's citing Somali tenants for failing to supervise children, while not citing non-African tenants for the same conduct. The Council alleged that the discrimination was "continuing" and that the last discriminatory event occurred on March 2, 2017. *Id.* at pp. A-12 to A-16.

In *Hassan v. Tomlinson*, an African American tenant complained of discriminatory terms and conditions at the Greenfield complex, including discriminatory enforcement of parking rules. *Id.* at pp. A-21 to A-24.

These four complaints pended with HUD for quite some time. Although they were filed in early 2018, HUD did not dismiss them until November 2019. Once the Council had those November 2019 decisions in hand, however, it apparently dropped the issue for over two years, until it filed this action in December 202.

The Council filed its fifth administrative complaint with HUD – related to the October 2018 testing at Latah Village – while the earlier HUD complaints were pending. *See Ex. C to Penny Dec.*, Dkt. 27-3, at pp. C-1 to C-5. HUD dismissed that complaint as well. As will be explained below, however, the Council timely complained about the October 2018 testing.

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party can show that, as to any claim or defense "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must enter summary judgment if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those "that might affect the outcome of the suit under the governing law." *Id.* at 248. Summary judgment is not appropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The Court does not make credibility determinations at this stage of the litigation, as such determinations are reserved

for the trier of fact. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 507 (9th Cir. 1992). In considering a motion for summary judgment, the Court must also view the facts in the non-moving party's favor. *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017).

## ANALYSIS

### A.  The FHA Claims

The FHA provides that an action must be filed in the appropriate federal or state court "not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice, . . . ." 42 U.S.C. § 3613(a)(1)(A). The Act also contains a tolling provision for administrative actions, stating that "[t]he computation of such 2-year period shall not include any time during which an administrative proceeding under this subchapter was pending with respect to a complaint or charge under this subchapter based upon such discriminatory housing practice." *Id.* § 3613(a)(1)(B).

The vast majority of the conduct alleged in the complaint occurred more than two years before plaintiff sued – even accounting for the relevant tolling periods. Indeed, many of the incidents occurred more than six years before plaintiff sued. Plaintiff acknowledges that these older incidents occurred outside the limitations period but says they are actionable because (1) each incident is allegedly part of a larger, overarching, "pattern of conduct," and (2) a handful of

the alleged incidents forming part of this alleged pattern occurred inside the limitations period. *See Response,* Dkt. 30, at 4.

The logical starting point, then, is to examine the timely, post-limitations conduct. After doing that, the Court will determine if those alleged incidents link up with the earlier, otherwise untimely, pre-limitations conduct such that the entire swath of conduct is covered by the continuing violations doctrine laid out in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982).

Plaintiff says three specific events occurred within the limitations period: (1) racial steering in October 2018; (2) discriminatory enforcement of parking rules in the summer of 2020; and (3) Defendant Stewart's refusal to add a roommate to the lease of an Iraqi American tenant during the summer of 2021.

### 1.  Allegations Related to Steering in October 2018

As a threshold matter, the Court must decide whether the alleged October 2018 steering occurred inside the limitations period. Resolving this issue boils down to deciding if the relevant administrative complaint was filed on June 27, 2019 or August 9, 2019. If it was filed on that earlier, June date, then the conduct occurred inside the limitations period.

The Council indisputably emailed an administrative complaint to HUD on June 27, 2019, and HUD received the complaint on that date. *See Fabbi Dec.*, *Ex. C thereto,* Dkt. 30-1. The Council thus says the complaint was "filed" on that date.

Defendants, however, argue that an administrative "complaint" is not truly "filed" until HUD personnel has reviewed the complaint and determined that HUD has jurisdiction. *See Lehman Dec.* ¶¶ 4-5, Dkt. 32-2. Only then, according to Defendants, is the information "converted" to a "complaint" and thus "filed." *Id.*

The Court has not uncovered any case that meaningfully discusses this issue, and the parties have cited none.[3] So the Court is left with HUD regulations, which are found in Title 24, Chapter I, Part 103 of the Code of Federal Regulations. Subpart B of Part 103, titled *Complaints*, lays out a series of regulations aimed at instructing a layperson how to file a complaint with HUD. These regulations are drafted in plain English, and they are set up as a series of questions and answers, with the title of each regulation drafted as a question, shown here:

**Subpart B   *Complaints*  §§ 103.10 – 103.40**

§ 103.10     What can I do if I believe someone is discriminating against me in the sale, rental, finance, or advertisement of housing?

§ 103.15     Can I file a *claim* if the discrimination has not yet occurred?

§ 103.20     Can someone help me with filing a *claim*?

§ 103.25     What information should I provide to HUD?

---

[3] Defendants cite *Lloyd v. Presby's Inspired Life*, 251 F. Supp. 3d 891 (E.D. Pa. 2017) and *Rosa v. Lawrence Housing Authority*, No. 18-CV-11576-DJC, 2021 WL 3054970 (D. Mass. July 20, 2021) but neither case meaningfully discusses the issue.

§ 103.30     How should I bring a *claim* that I am the victim of discrimination?

§ 103.35     Is there a time limit on when I can file?

§ 103.40     Can I change my *complaint* after it is filed?

The regulations do not separately define the terms "complaint" or "claim,"[4] but as shown by the italicized terms above, the drafters used those terms interchangeably in the regulation titles. And they continued to use the words interchangeably in the regulations themselves. For example, § 103.30, which is directly relevant here, provides:

**How should I bring a *claim* that I am the victim of discrimination?**

(a) You can file a *claim* by mail or telephone with any of HUD's Offices of Fair Housing and Equal Opportunity or with any State or local agency that HUD has certified to receive *complaints*.

(b) You can call or go to any other HUD office for help in filing a *claim*. These offices will send your *claim* to HUD's Office of Fair Housing and Equal Opportunity, which will contact you about the filing of your *complaint*.

24 C.F.R. § 103.30 (emphasis added). And § 103.35 goes on to inform individuals that they have one year in which to complain of discriminatory conduct. It

---

[4] The regulations do define the term "complainant," but it's not a particularly helpful definition. "Complainant" is defined, simply, as "the person (including the Assistant Secretary) who files a complaint under this part," 24 C.F.R. § 103.9.

provides:

> **§ 103.35 Is there a time limit on when I can file?**
>
> Yes, you must notify us within one year that you are a victim of discrimination. If you indicate that there is more than one act of discrimination, or that the discrimination is continuing, we must receive your information within one year of the last incident of discrimination.

24 C.F.R. § 103.35.

Notably, although this regulation refers to "filing," it does not use the word "complaint" or "claim." Rather, this time, the reader is just informed that their "information" must be received by HUD within one year of the last incident of discrimination.

When these regulations are viewed together, the logical view is that plaintiff – not HUD – controls the date an administrative complaint is filed and, further that a complaint is filed is the day HUD receives the "information" about the alleged discrimination. Based on Defendants' argument, HUD's internal practice of investigating the complaint – which HUD personnel label as an "inquiry" – and then later "converting" that "inquiry" to a "complaint," means that an individual could not control the date their administrative complaint is "filed." That runs counter to the entire regulatory scheme and, more generally, to the fundamental principle that plaintiffs should be able to control when they file a complaint and thus have certainty as to whether they are complying with any applicable

limitations periods.

For these reasons, the Court concludes that the Council's administrative complaint was "filed" on June 27, 2019 – not on August 19, 2019. As such, the Council has timely pursued this lawsuit, to the extent it complains about the alleged racial steering in October 2018. Defendants' motion for summary judgment on all FHA claims will therefore be denied. The Council may pursue this aspect of its FHA claims at trial.

### 2. Allegations Related to Enforcement of Parking Rules in 2020

The next incident that occurred within the limitations period involves the Council's allegation that Defendants violated the Fair Housing Act during the summer of 2020 by discriminatorily enforcing parking rules at the two complexes. As noted above, these allegations are contained in paragraphs 53 and 54 of the complaint. For ease of reference, those paragraphs are repeated here:

53.    In or about June or July of 2020, the Defendants renewed the parking rules and engaged Deep Six Parking and Security Services to enforce the parking rules at Latah Village and Greenfield.

54.    From in or about July 2020 through in or about August 2020, another resident of the Subject Property [Latah Village] who is a black African and immigrated from Somalia with limited English proficiency, informed the Plaintiff that the Defendants renewed their parking rules for Latah Village and that they and their friends were receiving car boots for parking in resident and visitor parking even after the signs indicating the nature of some of the parking spaces had been removed.

*Compl*, Dkt. 1, ¶¶ 53-54.

Defendants argue that these events, standing alone, fail to allege a claim under the FHA. The Court disagrees.

The legal framework governing this claim is set forth in 42 U.S.C. § 3604, which prohibits discrimination in the rental or sale of a dwelling based on certain protected characteristics, such as race, color, national origin, and familial status. *See* 42 U.S.C. § 3604. FHA claims may proceed under a disparate-treatment or a disparate-impact theory of liability. *See Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519 (2015). Here, plaintiff is apparently pursuing a disparate-treatment theory of liability.[5]

Plaintiffs pursuing disparate-treatment claims may rely on the familiar *McDonnell Douglas* burden-shifting framework to establish a prima facia claim. *See generally Pac. Shores Props. LLC v. City of Newport Beach,* 730 F.3d 1142, 1158 (9th  Cir. 2013); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The elements of such a claim are: (1) plaintiff was a member of a protected class; (2) plaintiff applied for, and was qualified to receive, a rental relationship or a term, condition, or privilege of a rental relationship; (3) the plaintiff was denied the

---

[5] In responding to the pending motion for summary judgment, the plaintiff did not once mention a disparate-impact theory. It did, however, repeatedly refer to alleged discriminatory treatment.

rental relationship or the housing-related term, condition, or privilege; (4) the rental relationship or the housing-related term, condition or privilege remained available to other, similarly situated individuals who were not members of the plaintiff's protected class. *See generally Gamble v. City of Escondido*, 104 F.3d 300, 305 (9th Cir. 1997). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to show a legitimate, non-discriminatory reason for its actions. *See McDonnell Douglas*, 411 U.S. at 802-03; *Gamble*, 104 F.3d at 305. If the defendant meets that burden, then the burden shifts back to the plaintiff to show that the stated reason is pretextual. *See McDonnell Douglas*, 411 U.S. at 804; *Gamble*, 104 F.3d at 305.

Notably, however, "a plaintiff does not . . . have to rely on the *McDonnell Douglas* approach to create a triable issue of fact regarding discriminatory intent in a disparate-treatment case. Instead, they may produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the defendant and that the defendant's actions adversely affected the plaintiff in some way." *Pac. Shores Props.*, 730 F.3d at 1159. A plaintiff taking this approach "need provide 'very little such evidence ... to raise a genuine issue of fact ...; any indication of discriminatory motive ... may suffice to raise a question that can only be resolved by a fact-finder." *Id.* (quoting *Schnidrig v. Columbia Mach., Inc.*, 90 F.3d 1406, 1409 (9th Cir. 1996)).

Here, when paragraphs 53 and 54 are viewed alongside the other allegations, the Council is complaining that black tenants of both apartment complexes were subjected to discriminatory enforcement of parking rules because of their race, color, or national origin during the summer of 2020. Given the history of allegedly discriminatory enforcement of parking rules at the complexes, and viewing these factual allegations in the Council's favor, there is a triable issue of fact as to whether the Defendants had a discriminatory motive in "renewing" parking rules in the summer of 2020, and in booting vehicles of black tenants during that time frame. *See generally id.* (citing *Arlington Heights v. Metro. Housing Corp.*, 429 U.S. 252 (1977) and explaining that if a plaintiff does not pursue a *McDonnell Douglas* approach, various factors, including the historical background of the decision, are relevant to determining whether defendants' actions were motivated by a discriminatory purpose). Accordingly, Defendants' summary judgment motion will be denied to the extent it has argued the Council cannot seek redress for the summer 2020 parking-related conduct.

### 3. Allegations Relating to the Request to Add a Roommate

The third and final incident that occurred within the limitations period involves the Iraqi American tenant of Latah Village who wished to add a roommate to her lease. Here, the Council alleges that Defendant Stewart denied the request – commenting that "illegals are not allowed" – after Ms. Alghizi informed

Stewart that the would-be roommate did not yet have identification. *Compl.*, Dkt. 1, ¶ 55. Thereafter, Latah Village issued three lease violations to Ms. Alghizi, refused to meet with her regarding the violations, and denied her second request to add a roommate to the lease. *Id.*

Defendants say the Council failed to state a claim based on these facts because the complaint does not explicitly allege, with respect to this incident, that Defendants "refus[d] to sell or rent after the making of a bona fide offer," or "refuse[d] to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.'" *Mtn.*, Dkt. 27-1, at 14-15. The Court is not persuaded by this argument. Reading these factual allegations of paragraph 55 together with later allegations, which lay out the elements of discrimination claims under the FHA, the Court concludes that the Council has plausibly alleged a claim. Again, it's worth noting that the Defendants do not dispute any of the underlying factual allegations for purpose of this motion. On this record, the Court concludes that the Council may proceed to trial on this aspect of its FHA claims.

### 4.  The Continuing Violations Doctrine

The next question is whether the three timely incidents just discussed are part of a larger pattern of discrimination, such that the Council can seek relief for *all* conduct alleged in the complaint – not just the conduct occurring within the

limitations period. The Council says it is entitled to do so under the continuing violations doctrine of *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). The Court is not persuaded. The Council is reading *Havens* too broadly and the case is distinguishable.[6]

In *Havens,* three individual plaintiffs and a non-profit organization, HOME, sued Havens Realty Corporation for alleged "racial steering" in violation of the FHA. One of the plaintiffs, Sylvia Coleman, was an African American tester employed by HOME to find out whether Havens was engaging in racial steering. Coleman alleged that Havens gave her false housing information, violating the FHA, on four different dates, *each outside the statute of limitations*. On a fifth date, *this time within the statute of limitations*, Havens allegedly gave similarly false information to another African American plaintiff, Paul Coles.

Coleman (the African American tester plaintiff) alleged two distinct types of injuries resulting from the alleged racial steering: (1) that she was denied the benefits of living in an integrated neighborhood (the "neighborhood" claim); and

---

[6] Some courts have concluded that *Havens'* continuing violations doctrine has been limited by the Supreme Court's later decision in *National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101 (2002). The Ninth Circuit has not yet reached that conclusion, however. *See Alpha III, Inc. v. City of San Diego*, 187 Fed. Appx. 709, 710 n.1 (9th Cir. 2006) (unpublished decision; observing that it would apply *Havens* "because the Court in *Morgan* had no occasion to consider an FHA claim or the holding in *Havens* . . . ."). This Court does not need to weigh in on that issue. For starters, the parties did not brief the issue. But even if they had, the Court does not need to resort to *Morgan* to determine that the continuing violations doctrine does not permit the Council to seek redress for the pre-limitations conduct alleged here.

(2) that on those four separate occasions, she was given false information. The organizational plaintiff, HOME, claimed "injury to its counseling and referral services" from the individual "tester" incidents, and also from the alleged "continuing policy and practice of unlawful racial steering that extends through the last alleged incident." *Id.* at 381.

The Court held that Coleman's "neighborhood" claim was timely. That claim, the Court stated, was based "not solely on isolated incidents," but on a "continuing violation" manifested in a number of incidents," including at least one, involving Coles, within the statute of limitations. *Id.* at 381. The Court explained that a "continuing violation" of the FHA should be treated differently from one discrete act of discrimination: "Where a plaintiff, pursuant to the Fair Housing Act, challenges not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period, the complaint is timely when it is filed within 180 days of the last asserted occurrence of that practice." *Id.* at 380-81. (At the time, the statute of limitations was 180 days; it is now two years.)

Notably, however, the Court did not apply the continuing violation doctrine to Coleman's untimely "tester" claims. That is, even though there was a continuing violation, the tester plaintiff with the untimely claim could not seek damages for the untruthful information that was provided to her on an earlier date, outside the limitations period. As the Court explained:

"We do not agree with the Court of Appeals, however, that insofar as respondent Coleman has standing to assert a claim as a "tester," that she may take advantage of the "continuing violation" theory. *Her tester claim, is, in essence, that on four isolated occasions she received false information from petitioners in violation of § 804(d). It is not alleged, nor could it be, that the incident of steering involving Coles on July 13, 1978 deprived Coleman of her § 804(d) right to truthful housing information*."

*Id.* at 381 (emphasis added).

This case is easily distinguishable from *Havens*. Most significantly, the *Havens* plaintiffs articulated a specific discriminatory practice – "racial steering" – and then identified five incidents of steering. Those five incidents occurred over a four-month time span and involved precisely the same conduct – prospective black tenants were falsely informed that no apartments were available.

Here, the Council does not carefully identify a single discriminatory practice. Rather, plaintiff has alleged a variety of different incidents and different types of discriminatory treatment that occurred sporadically over a six-year time frame – with large periods of time where no specific incidents are alleged to have occurred. The failure to identify a specific, discriminatory practice is critical, as the Supreme Court has "'stressed the need to identify with care the specific [discriminatory] practice that is at issue.'" *Garcia v. Brockway*, 526 F.3d 456, 462 (9th Cir. 2008) (citing *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007)).

In addition to failing to identify a specific discriminatory practice, it cannot be said that plaintiff has alleged an "ongoing" violation, given the large gaps in time between the alleged incidents. For example, with respect to the allegation that Defendants engaged in "discriminatory enforcement of parking rules," even assuming there was an ongoing practice during 2015 and 2016, there are no allegations of any parking-related discrimination during the years 2017, 2018, or 2019. That large gap, standing alone, is sufficient for this Court to determine that plaintiff cannot properly exhume the parking-related conduct from 2015 and 2016 by way of the continuing violations doctrine. Borrowing from *Havens*, the individuals who suffered an injury in 2015 and 2016 couldn't have been harmed by any parking-related incidents that occurred in 2020.

The same is true regarding the Council's "tester" allegations. Unlike in *Havens* where the inquiries about the availability of apartments were basically identical and occurred over a four-month span, the testing alleged here took place years apart and dealt with different inquiries and had different purposes. In this case, in August and September of 2016, black testers were told apartments were not available whereas white testers were told apartments were available. Similar testing, with similar results, was conducted in February and March of 2017 – some four years before the complaint was filed. Roughly 18 months later, in October 2018, the Council conducted a third round of testing. Unlike earlier rounds of

testing, where black testers simply asked if apartments were available, this time the Council had an Iranian tester "with an obvious Iranian accent" call and ask about occupancy limits. This testing was conducted after a black seven-person family was threatened with eviction from their three-bedroom apartment for violating the two-people-per-bedroom occupancy limit. *Compl.,* Dkt. 1, ¶ 47.

Granted, there is a relationship, but given that the 2018 testing had a different purpose and was conducted some 18 months after the earlier testing, the Court cannot conclude that all incidents of testing fall with the confines of the continuing violations doctrine articulated in *Havens.* It's also worth repeating that the Supreme Court did not allow the "tester" claims to move forward in *Havens*; only the "neighborhood" claims were allowed to proceed. As such, the Council's efforts to recover damages for each tenant who allegedly suffered a wrong from 2015 forward is well outside the bounds of *Havens.*

Finally, moving to the third alleged timely incident, the Court is not persuaded that the incident in 2021 with the Iraqi American tenant is connected to any other incident alleged in the complaint within the meaning of *Havens.* Ms. Alghizi is not referenced anywhere else in the complaint, and there are no other allegations that Defendants refused to add would-be roommates to leases.

For all these reasons, the Court will grant the summary judgment motion to the extent Defendants seek to prevent the Council from recovering damages for

allegedly wrongful conduct that occurred outside the relevant limitations periods. Based on this ruling, the Court will dismiss defendant Michelle Charlton, as she stopped working for Tomlinson in 2017. *See Penny Dec.*, Dkt. 27-3, ¶ 8.

## B.  The Negligence Claim

The Court will deny Defendants' motion for summary judgment on the negligence claim. Defendants argue that this claim is barred for three reasons. First, they argue that the economic-loss doctrine bars the claim. Second, they argue that plaintiff failed to properly allege a negligence supervision and training. Third, defendants argue that, in any event, there is no duty to train employees regarding compliance with the Fair Housing Act. The Court finds none of those arguments persuasive.

### 1. The Economic Loss Doctrine

The economic loss doctrine has generated confusion when applied outside the product-liability context. *See Giles v. GMAC,* 494 F.3d 865, 874 (9th Cir. 2007). As more than one court has observed, the rule has been "stated with ease but applied with great difficulty." *Id.* (citing *Indem. Ins. Co. v. Am. Aviation, Inc.*, 891 So.2d 532, 544 (Fla. 2004) (Cantero, J., concurring)). The basic idea, however, is that if parties enter into a contract, then the law of contracts should define their economic relationship and expectations – not the law of torts. *See generally BrunoBuilt, Inc. v. Briggs Engineering, Inc.*, — P.3d —, 2023 WL 2375766, at *5

(Idaho 2023) (describing the economic loss rule as "a doctrine of judicial construct that acts as a boundary between tort and contract law"). In Idaho, the doctrine has been expanded to include all negligence actions – not just those actions where the litigants are in contractual privity with one another. Thus, with some limited exceptions that do not apply here, plaintiffs cannot pursue negligence claims if they have suffered purely economic losses. *See generally Blahd v. Richard B. Smith, Inc.,* 108 P.3d 996, 1000 (Idaho 2005).

Defendants argue that because the Council is seeking money damages, it has alleged purely economic harms. But just because a person seeks money damages does not necessarily mean that the underlying, alleged harm is a purely economic harm. Here, the Council alleges that Defendants' actions have frustrated its mission of "ensuring open and inclusive housing for all people, and to advance equal access to housing for all persons without regard to race, color, sex, religion, national origin, familial status, sexual orientation, gender identity, source of income, or disability." *Compl.*, Dkt. 1, ¶¶ 3, 14, 15.

Defendants have not pointed to any authority holding that this particular type of harm should be categorized as a purely economic injury in the context of applying the economic loss doctrine. Moreover, many courts have recognized that a litigant's interest in encouraging open housing is noneconomic. In *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), for example, in deciding that a nonprofit

organization had standing to sue, the Supreme Court stated: "That the alleged injury results from the organization's *noneconomic interest in encouraging open housing* does not [a]ffect the nature of the injury suffered, and accordingly does not deprive the organization of standing." 455 U.S. at 379, n.20 (emphasis added); *see also, generally, Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 111 (1979) (finding village alleged injury in fact by alleging racial steering deprived it of "racial balance and stability"); *Trafficante v. Metro. Life Ins. Co.,* 409 U.S. 205, 209-10 (1972) (finding cognizable injury to apartment tenants for "loss of important benefits from interracial associations"); *City of Sacramento v. Wells Fargo & Co.*, No. 2:18-cv-00416-KJM-GGH, 2019 WL 3975590, at *11 (E.D. Cal. Aug. 22, 2019) (observing that "[n]on-economic injuries are generally cognizable under the FHA"). In light of this authority, the Court concludes that the Council has alleged a noneconomic injury. Thus, its negligence claim is not barred by the economic loss doctrine.

### 2. General Negligence versus Negligent Supervision & Training

Defendants also argue that the negligence claim fails because the Council failed to allege a legally recognized duty. In response, the Council clarified that it is pursuing a negligent supervision and training claim. Defendants complain that Council did not plead *this* claim and that it is attempting to "smuggle" a negligent supervision claim into the general negligence claim alleged in the complaint.

*Reply,* Dkt. 31, at 8. According to Defendants, negligence and negligent supervision and training "are two separate causes of action requiring different elements, and must be pled separately." *Id.*

The Court respectfully disagrees for a number of reasons. First, the Court disagrees with Defendants' assessment of the complaint. Paragraph 20 alleges that "the Defendants have failed to use reasonable care to avoid injury and to prevent unreasonable, foreseeable risks of harm to the Plaintiff *by failing to adequately train and supervise the agents and employees of the Defendants* with regards to the requirements of the FHA." *Compl.*, Dkt. 1, ¶ 20 (emphasis added). Similar verbiage is repeated in paragraph 90, under the heading "Count Six – Negligence." *Id.* ¶ 90. Given these allegations, Defendants had fair notice that the Council was pursuing a negligent supervision and training claim.

Second, and more generally, a negligent supervision and training claim is best understood as an application of ordinary negligence principles in a specific context. As such, either a general negligence claim or a negligent supervision and training claim will require proof of the four familiar elements of negligence: (1) the existence of a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of that duty; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual loss or damage. *See generally Black Canyon Racquetball Club, Inc. v. Idaho First Nat'l*

*Bank,* 804 P.2d 900, 904-05 (Idaho 1991).

In the context of a negligent supervision and training claim, the legally recognized duty is the duty to properly supervise and train employees. More specifically, as the Idaho Court of Appeals has explained, the claim is based "upon the employer's own negligence in failing to exercise due care to protect third parties from the foreseeable tortious acts of an employee." *Rausch v. Pocatello Lumber Co.*, 14 P.3d 1074, 1080 (Ct. App. Idaho 2000). In that regard, an employer "who knows of an employee's dangerous propensities" has a duty to "control the employee so he or she will not injure third parties." *Id.* The Council tracked this language in its complaint. *See Compl.*, Dkt. 1, ¶¶ 20, 88, 90. Accordingly, the Court is not persuaded that the Council failed to plead a viable negligent supervision and training claim.

### 3. Duty to Supervise & Train Regarding FHA Requirements

The final question is whether the Council may rely on Defendants' alleged failure to train and supervise its employees regarding the requirements of the Fair Housing Act. Defendants argue that there is no such legal recognized duty – which logically means that the claim must be dismissed. As Defendants put it, "If no duty exists, there can be no negligence." *Reply*, Dkt. 31, at 8.

Neither party has cited any authority on this point, but courts in other jurisdictions have concluded that the FHA does not impose a common-law duty to

supervise and train employees regarding FHA requirements.[7] But the Idaho courts haven't yet addressed this issue, and based on existing Idaho caselaw, this Court predicts that Idaho courts would view the issue more broadly. The Idaho appellate courts have outlined the contours of a negligent supervision and training claim in broad, general terms. *See, e.g., Rausch*, 14 P.3d at 1080. And it is not possible to predict every factual situation that might arise within the context of an employer's duty to supervise its employees. Here, based on the facts alleged in the complaint, Defendants' failure to supervise and train its employees with respect to the requirements of the FHA was part and parcel of its broader duty to control those employees so that they would not harm third parties. Accordingly, the Council has alleged a viable negligence claim.

## C.  Motion to Dismiss Defendants Latah Village Apartments, Greenfield Apartments, and Gotta LLC

Finally, the Court will grant Defendants' motion to dismiss Latah Village

---

[7] *See Matarese v. Archstone Pentagon City,* 761 F. Supp. 2d 346, 365 (E.D. Va. 2011) (granting summary judgment on plaintiff's negligence claim predicated on an asserted common-law duty to train employees on FHA reasonable accommodations)*; Fair Housing Center of Central Indiana v. Grandville Coop. Inc.*, No. 1:16-cv-00300-LJM-DML, 2017 WL 75447 (S.D. Ind. Jan. 9, 2017); *Fair Hous. Council of Or. v. Brookside Vill. Owners Ass'n,* No. 3:08-cv-3127, 2012 WL 8017842, at \*27-28 (D. Or. Oct. 19, 2012) adopted, No. 3:08-cv-03127 2013 WL 1914378 (D. Or. May 8, 2013) (rejecting plaintiff's assertion that the Oregon fair housing statute, which is interpreted consistently with the FHA, "is intended to impose a common law duty on housing developments ... to train their employees in fair housing laws."); *Hand v. Gilbank,* 752 N.Y.S.2d 501, 502 (N.Y. Sup. Ct. 2002) (finding that the FHA "was not intended to create a standard of care in negligence litigation").

Apartments and Greenfield Apartments as defendants.

The Council named six entity defendants in its complaint: (1) Tomlinson & Associates, Inc.; (2) Latah Village Apartments; (3) Latah Village LLC; (4) Greenfield Apartments; (5) Gotta LLC; and (6) Greenfield LLC. Defendants say two of these entities – Latah Village Apartments and Greenfield Apartments – are not actually legal entities that can sue or be sued; rather they are simply pieces of property that happen to have apartment complexes upon them. The Council did not respond to that argument. The Court will therefore dismiss these defendants, noting that the Council has alleged that the three remaining entity defendants (Latah Village LLC, Greenfield LLC, and Gotta LLC) owned the apartment complexes during the relevant times.

Defendant Gotta LLC says that it, too, should be dismissed as a defendant because it is simply a passive investor in Greenfield LLC. The evidence, however, shows that Gotta LLC owned the Greenfield Apartment complex property – and was not simply a passive investor in the owner – between 2014 and November 2020. Some of the alleged discriminatory acts took place at the Greenfield Apartment complex during that time period. Accordingly, the Court will deny the motion to dismiss Gotta LLC as a defendant. *See generally Meyer v. Holley*, 537 U.S. 280, 285 (2003) ("[I]t is well established that the [FHA] provides for vicarious liability.").

MEMORANDUM DECISION AND ORDER - 31

## ORDER

**IT IS ORDERED that** Defendants' Motion for Summary Judgment (Dkt. 27) is **GRANTED in part** and **DENIED in part** as follows:

(1) The motion is **denied** to the extent that the Court will not enter summary judgment on any of the claims alleged in the complaint. Rather, the Council may proceed to trial on all claims, as explained further above.

(2) The motion is **granted** to the extent that the Council may not seek redress for events that occurred before the relevant limitations periods.

(3) The motion is further **granted** to the extent that entity defendants Latah Village Apartments and Greenfield Apartments, and individual defendant Michelle Charlton, are **DISMISSED** as defendants in this action.

DATED: March 29, 2023

B. Lynn Winmill
U.S. District Court Judge